# UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

| | | |
|---|---|---|
| ABEL M. CAMPOS, JR., | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| *v.* | § | Civil Action No. SA-18-CV-357-XR |
| | § | |
| STEVES & SONS, INC., | § | |
| | § | |
| *Defendant.* | § | |

## <u>ORDER ON MOTION FOR SUMMARY JUDGMENT</u>

On this date, the Court considered Defendant Steves & Sons, Inc.'s Motion for Summary Judgment (docket no. 37), Plaintiff Abel Campos's Response (docket no. 43), and Defendant's Reply (docket no. 45). The Court further considered Defendant's Motion to Strike Plaintiff's Designation of Expert Witnesses (docket no. 38), Plaintiff's Amended Response (docket no. 40), and Defendant's Reply (docket no. 44). Finally, the Court considered Defendant's Motion to Strike Response to Motion (docket no. 46), Plaintiff's Response (docket no. 47), and Defendant's Reply (docket no. 48).

After careful consideration, the Court GRANTS Defendant's Motion for Summary Judgment with respect to all claims (docket no. 37). The Court GRANTS in part Defendant's Motion to Strike Response (docket no. 46) and DISMISSES as moot Defendant's Motion to Strike Designation of Expert Witnesses (docket no. 38).

# BACKGROUND[1]

This case arises out of Plaintiff Abel Campos's ("Plaintiff") employment with Defendant Steves & Sons, Inc. ("Defendant"), a San Antonio-based door manufacturer. Docket no. 37-2 at 6. Defendant hired Plaintiff in December 2008, at which time he began working as a welder. Docket no. 43-1 at 4. Plaintiff eventually became a Welder-Mechanic in the Maintenance Department, where he was charged with maintaining and rebuilding glue spreaders. Docket no. 37-3 at 8. This job required long hours and it regularly required lifting objects weighing up to fifty pounds as well as frequent walking, standing for extended periods of time, and stooping. *Id.* at 9-10; docket no. 37-43 at 3.

In April 2010, Plaintiff took his first FMLA leave for a non-work-related medical condition, a leave of just over twelve weeks, after which he was fully reinstated. Docket no. 37-3 at 15-17. Plaintiff admits he suffered no form of demotion, adverse employment decision, or retaliation due to that leave, and he further admits he received the proper FMLA written notice and understood Defendant's policy required him to bring a physician's return-to-work note to be reinstated. *Id.* at 16-17.

In the summer of 2015, Plaintiff's physician recommended that, due to heart complications, Plaintiff undergo surgery to repair his heart valves. Docket no. 43-5 at 24. Plaintiff informed his immediate supervisor, Salgino Guerra ("Guerra"), who referred Plaintiff to Susan Santana, Defendant's HR Manager ("Santana"). Docket no. 43-1 at 6. At least one month prior to his

---

[1] These facts are taken from the pleadings and supporting evidence on the record. Where the nonmoving party has failed "to address or respond to a fact raised by the moving party and supported by evidence, then the court may consider the fact as undisputed." *Broadcast Music, Inc. v. Bentley*, Civil Action No. SA-16-CV-394-XR, 2017 WL 782932, at *2 (W.D. Tex. Feb. 28, 2017) (citing FED. R. CIV. P. 56(e)(2)).

surgery, Plaintiff provided Defendant with his FMLA certification from Dr. Wendy Carpenter. Docket no. 37-3 at 13. Plaintiff's last day of work was July 20, 2015. *Id.* at 18.

On August 5, 2015, Plaintiff underwent heart surgery, during which he experienced numerous complications that left him comatose and in critical condition for several weeks. Docket no. 43-5 at 25. Subsequent complications and diagnoses included end-stage renal disease, respiratory failure, a stroke, and pneumonia. Docket no. 37-3 at 19; no. 37-10 at 2; no. 37-11 at 6. Plaintiff was not discharged from the hospital until September 16, and his discharge paperwork from that day indicates he was not to return to work until cleared by a clinic physician. Docket no. 37-3 at 23; no. 37-11 at 7; *see also* docket no. 43-5 at 28 (indicating Plaintiff understood the requirement of obtaining a *physician's* release to return to work).

Plaintiff underwent another surgery on October 7, 2015 after a previously-placed hemodialysis catheter did not improve Plaintiff's kidney function. Docket no. 37-15 at 2. On October 27, 2015, Plaintiff visited Dr. Taylor Hicks of UHS's Dialysis Clinic, where Dr. Hicks noted that Plaintiff suffered from hypertensive heart disease as well as stage five chronic, or end-stage, renal disease. Docket no. 37-16 at 2. Dr. Hicks noted that Plaintiff had recovered well from his October 7th surgery but that Plaintiff continued to complain of certain symptoms that were "not well controlled." Docket no. 37-17 at 2. On that same day, UHS's Transplant Coordinator attempted to contact Plaintiff to proceed with a kidney transplant evaluation. Docket no. 37-14 at 2.[2] Also on that day, Plaintiff met with Santana, where he mentioned he would need to attend

---

[2] Plaintiff alleges that on that same day, he received a "return to work" note signed by "Denise Sanchez, LVN." Docket no. 43-5 at 39-40. Plaintiff contends he presented this note to Santana, *id.*, who later harbored doubts as to its legitimacy because it was signed by an LVN rather than a physician, as required by company policy. Docket no. 43-2 at 16.

Defendant moves to strike this letter. Docket no. 46. Hearsay evidence, unless it falls within a recognized exception, is not competent summary judgment evidence. *See Fowler v. Smith*, 68 F.3d 124, 126 (5th Cir. 1995). The Court agrees with Defendant that the letter is hearsay and that no exception – either provided by Plaintiff or the Court – applies. The letter is an out-of-court statement offered to prove the truth of the matter asserted, i.e. the letter, stating Plaintiff is fit to return to work, is offered to prove Plaintiff was fit to return to work. FED. R. EVID. 801. The letter is

dialysis appointments but did not indicate he would need any further accommodations. Docket no. 43-2 at 14-18; no. 37-3 at 27.[3]

Several weeks later, Plaintiff returned to work, where he met with Jim Parker ("Parker"), Defendant's Chief Engineer, who told him to return to work the following Monday. *Id.*; docket no. 43-5 at 44. Santana and Karen Schram ("Schram"), both with HR, told Parker that Plaintiff still needed an appropriate medical release signed by a physician, though Parker did not discuss that with Plaintiff, as Parker believed that "this was an HR thing, whether he had a medical release…." Docket no. 37-41 at 4.

As scheduled, the following Monday Plaintiff returned to work, where he recorded a meeting with Parker. Docket no. 43-5 at 44; no. 43-12.[4] In that meeting, Parker informed Plaintiff that Defendant had filled his previous position during Plaintiff's absence because Defendant

---

not, as Plaintiff argues, admissible under Rule 803(4), the exception for "[s]tatements made for purposes of medical diagnosis or treatment" because the statement was made *by* a medical professional and not *to* one. *See Rock v. Huffco Gas & Oil Co., Inc.*, 922 F.2d 272, 277 (5th Cir. 1991). Plaintiff next argues the letter is admissible as an adoption under Rule 801(d)(2)(B), but Defendant's mere receipt of the letter is not an adoption of the contents of the letter. Further, the letter is not proven up by any business record or evidence from Denise Sanchez or any of Plaintiff's medical records. FED. R. EVID. 803(6). Plaintiff does not make any attempt at authentication or even recall having met a Denise Sanchez. Docket no. 46-1 at 10. Accordingly, the Court grants Defendant's motion to strike with the respect to the letter and will not consider the letter in its analysis though, where applicable, the Court will note why the letter would not change the outcome as a matter of law.

[3] Plaintiff alleges that Guerra, Defendant's Maintenance Department Manager, sent him a text message on September 9 in which Guerra stated that "You won't be able to work for us due to your condition." Docket no. 43 at 5. Defendant moves to strike these text messages. Docket no. 46 at 3. Though there is doubt as to the authenticity of these messages, given Plaintiff's deletion of parts of the conversation and Plaintiff's failure to respond to Defendant's motion to strike these messages, the Court denies Defendant's motion. Nonetheless, the inclusion of such texts does not change the Court's analysis; it is clear Plaintiff knew he was not terminated at that time because he immediately thereafter contacted HR, who informed him that he was still employed, provided he brought an appropriate physician release. Docket no. 43-5 at 28. Further, Plaintiff admits knowing that Guerra was not responsible for hiring or firing. Docket no. 37-3 at 7.

[4] These audio recordings are also subject to Defendant's motion to strike. Docket no. 46 at 4. Defendant presents an expert report concluding that at least one of the recordings is not authentic and has been doctored. *Id.* Plaintiff has designated an opposing forensic expert. Docket no. 41. It is not the Court's province to decide the credibility between two "dueling experts" at the summary judgment stage. *See, e.g. James v. United States*, No. SA-12-CA-800-FB, 2013 WL 12106710, at *2 (W.D. Tex. June 24, 2013) ("In a battle of competing experts, it is not the role of the Court upon a motion for summary judgment to pick between these experts…"). For that reason, the Court denies Defendant's motion to strike the recordings but finds that the admission of such recordings does not change the outcome as a matter of law.

"literally could not operate" without glue spreaders. Docket no. 43-3 at 5-6; no. 43-12 at 20; no. 37-3 at 8. In the recording, Plaintiff and Parker discuss an alternative job placement for Plaintiff. *Id.* Parker offered Plaintiff a replacement job in the steel door manufacturing line, a job that came with "equal pay and better status, better conditions, [was] more friendly to him and his conditions, and…[was] a better job for advancement…." Docket no. 37-41 at 4; no. 43-12 at 28-29 ("This here is going to be a lot less strenuous work than lifting and pushing and shoving…."). The steel manufacturing line was part of a growing $7 million investment, and Parker noted he saw this job as a good fit for Plaintiff because of "his mechanical ability, his maturity, and his common sense…" Docket no. 37-41 at 4. The new position would require several physical demands – including sitting and standing for extended periods of time – but these were less strenuous than Plaintiff's previous position. Docket no. 37-43 at 2.

In this meeting, Parker urged Plaintiff to demonstrate his commitment to the steel manufacturing line. Docket no. 43-12 at 24 ("[Y]ou have to convince me that this is something you really want to do for a [sic] future, and that's what you want to do…to work on the steel line for me to go down that road because it's a lot of training."). Plaintiff remarked "I'll take the job because I need a job," and "If that's where you put me, well, then there's nothing I can say." *Id.* at 25. This was not, however, a formal offer of the steel manufacturing position. Docket no. 37-41 at 5. Rather, Parker stated he needed to talk to managers at the new position to ensure it was an available position. *Id.*; docket no. 43-12 at 29. At that point in the meeting, Plaintiff asserted that he was "a hundred percent released" to work, with no restrictions. *Id.* at 31-32.

On November 30, 2015, Plaintiff returned to work, where he met again with Parker. Docket no. 43-14. In that conversation, Parker told Plaintiff that "the green light had been given for him to take [the steel line] job." Docket no. 37-41 at 5. Plaintiff also recorded this conversation, though

the transcript begins midway through the conversation. Docket no. 43-13.[5] Parker recalls "three different times coming back to that this is a really good job for him and I could really use him. Because we needed to build a team. This is a $7 million-dollar investment; we've got to have a team of operators." Docket no. 37-41 at 6. Parker told Plaintiff that "there was a stool that he could sit on at the computer console because of the – leg situation, which is all I knew about his condition." *Id.* at 8.  It is clear from both the partial transcript and Parker's recollection that Plaintiff turned down the job and that his employment was thereby terminated. *Id.* at 6-8 ("[H]e came into that second meeting already determined…that he wasn't going to take the job, that wasn't what he wanted. He wanted to do welding and fabrication….").

Later that day, Santana filled out an Unemployment Compensation Management Separation Record, where she wrote that Plaintiff "was terminated because he exhausted his FMLA leave[6] (and was not making monthly payments on ins[urance]. And also for medical reasons." Docket no. 43-2 at 20.[7]

On December 16, 2015, Plaintiff first applied for Social Security Disability Insurance ("SSDI") benefits. Docket no. 37-29 at 2. Plaintiff's daughter filled out the initial application, but Plaintiff was present and reviewed the forms before their submission. Docket no. 37-3 at 32-33. The application stated "I became unable to work because of my disabling condition on July 20, 2015. I am still disabled." Docket no. 37-29 at 2. Plaintiff himself subsequently filled out a Work

---

[5] Without Plaintiff presenting any evidence – admissible or not – as to the beginning of that conversation, the Court finds it undisputed that Plaintiff turned down the steel manufacturing job. Docket no. 37-41 at 6 ("He told me that's just not what he wanted to do. His heart – he said, 'That's not what I am. I just really like welding and fabricating.'"); *see Broadcast Music, Inc.*, 2017 WL 782932, at *2.

[6] There is dispute as to whether Plaintiff's FMLA leave began on July 20, 2015 (his last day at work) or August 5, 2015 (his surgery date).  This dispute is immaterial because in either case it is clear that by November 30, Plaintiff had exceeded the twelve weeks of leave required by the FMLA.

[7] In his briefing, Plaintiff remarks that he "was discharged for *abusing* his FMLA leave benefits." Docket no. 43 at 11 (emphasis added). The record, including the deposition to which Plaintiff cites, does not support that. Rather, the record shows that one of the reasons for Plaintiff's termination was that he *exhausted* his FMLA leave. Docket no. 43-2 at 20.

History Report for the SSA. Docket no. 37-5.[8] In that report, Plaintiff indicated he regularly lifted up to twenty-five pounds and sometimes up to 100 pounds. *Id.* He further noted that his job required him to perform physical tasks such as climbing, crouching, crawling, and handling big objects. *Id.* In January 2016, Plaintiff submitted a "Function Report-Adult" to the SSA in which he remarked that:

> The severity of my injuries has prevented me from working most recently due to numerous complications since waking up from the coma. I experience total numbness in my arms, hands, feet, back, and feet. Along with tingling and numbness in my neck caused by a plate holding a few of my discs from being crushed. My motor skills have been greatly affected as well. Walking or sitting seems to be a task now. Or just causes major discomfort in my hips and knees.

Docket no. 37-30 at 2. He also noted that "I can no longer weld since waking up from my coma, or stand for long periods of time." *Id.* at 6. He indicated he struggles with tasks such as lifting, standing, walking, completing tasks, concentration, and using his hands. *Id.* at 7.

A month later, Plaintiff saw Dr. Samir Patel and Dr. Scott Spendlove at UHS's Vascular Surgery Lab. Docket no. 37-21. In that evaluation, Plaintiff complained of continuing "pins and needles…, feeling mentally slower, and an awkwardness with doing tasks that he used to be able to do, like raking the leaves. Walking up steps is harder…." *Id.* at 5. The report further notes that Plaintiff "displays weakness and abnormal reflex." *Id.* at 6. Though Plaintiff's mood, affect, and judgment were normal, he exhibited "abnormal new learning ability and abnormal recent

Also in January 2016, Dr. Mamta Kumar with University Hospital completed a physical therapy evaluation of Plaintiff and noted in the report that Plaintiff was not working, and that one of his goals was to be able to work. Docket no. 37-19 at 3. Dr. Kumar did note that Plaintiff's rehabilitation potential was "good." *Id.* at 6.

---

[8] Plaintiff first claimed that he never filled out anything for the SSA on his own but later admitted he personally completed the Work History Report. Docket no. 37-3 at 32, 34.

memory," with "frequent word searching and inability to remember words and terms." *Id.* The report's plan expresses concern that Plaintiff had an anoxic brain injury caused by his stroke and recommends further neurology consultations, lidocaine infusion, and beginning treatment with gabapentin. *Id.*

In March 2016, Plaintiff saw Darren Hackey, a physical therapist with UHS. Docket no. 37-22. In that evaluation, Plaintiff reported that physical therapy had helped with thoracic back pain but that he continued to have "pain, numbness, and tingling in the mid-back." *Id.* at 3. Mr. Hackey suggested further MRI imaging to investigate potential spinal issues. *Id.* The report also notes that Plaintiff "feels that he is unable to return to work, although he would like to." *Id.* Plaintiff visited Mr. Hackey again later that year, where he reported he had difficulty walking, climbing stairs, and doing yard and housework. Docket no. 37-28 at 2.

Also in March, Plaintiff filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and the Texas Workforce Commission-Civil Rights Division ("TWC-CRD"). Docket no. 37-31 at 2. In that Charge, Plaintiff claims his termination was the result of disability discrimination and retaliation for requesting a reasonable accommodation. *Id.* In response, Plaintiff received a Right to File Civil Action notice. Docket no. 1-5 at 10.

On April 15, 2016, Plaintiff filled out a new patient form at the Orthopedic Spine Clinic in which he noted his pain was a nine out of ten and that his pain prevented him from moving. Docket no. 37-23 at 2. A physician's report from that visit remarked that Plaintiff had difficulty standing for more than an hour and that "physical therapy for one month has not provided any relief." *Id.* Plaintiff also reported upper extremity weakness and difficulty with fine motor control. *Id.* Days later, Plaintiff visited the same physician, who noted that plaintiff "is having a difficult time getting back into the workforce due to weakness and inability to perform his typical duties as a welder."

Docket no. 37-25 at 2. The treating physician expressed that his "symptoms are again concerning for cervical myelopathy and lumbar radiculopathy." *Id.* at 4. He did report, however, that Plaintiff's symptoms had stabilized and that Plaintiff would like to continue nonoperative management. *Id.*

Several times in July and September of 2016, Plaintiff met with Dr. Pearl Jones of the UT Health Science Center, who, when referring to Plaintiff's pain, noted that "Nothing makes it better…Gabapentin didn't help. Lidocaine helped for a few days…." Docket no. 37-26 at 2. She also noted continuing memory issues. *Id.* On September 21, Dr. Jones issued a letter in which she noted that Plaintiff suffered from "several active neurologic issues which may prevent his ability to work" and that "[h]is treatment is ongoing." Docket no. 37-34 at 2. Plaintiff initiated this lawsuit on November 14, 2016 in Texas state court. As presently before the Court, Plaintiff accuses Defendant of disability discrimination and failure to accommodate under the Texas Labor Code and the Americans with Disabilities Act ("ADA")[9], retaliation under the Texas Labor Code and the Family Medical Leave Act ("FMLA"), and interference under the FMLA. Defendant moves for summary judgment on all claims.

## DISCUSSION

### I.     Standard of Review

The Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. To establish that there is no genuine issue as to any material fact, the movant must either submit evidence that negates the existence of some material element of the non-moving

---

[9] Plaintiff's Amended Petition makes no claim under the ADA, solely Chapter 21, but both parties subsequently provide arguments under the ADA. *See, e.g.*, docket no. 43 at 27. Because courts interpreting the Texas Labor Code look to federal cases as precedent, this Court – as the parties have done – will consider both the state law claim and the ADA. *See NME Hosps. Inc. v. Rennels*, 994 S.W.2d 142, 144 (Tex. 1999). The Court will note where the two diverge.

party's claim or defense, or, if the crucial issue is one for which the non-moving party will bear the burden of proof at trial, merely point out that the evidence in the record is insufficient to support an essential element of the non-movant's claim or defense. *Lavespere v. Niagara Mach. & Tool Works, Inc.*, 910 F.2d 167, 178 (5th Cir. 1990). Once the movant carries its initial burden, the burden shifts to the non-movant to show that summary judgment is inappropriate. *See Fields v. City of S. Hous.*, 922 F.2d 1183, 1187 (5th Cir. 1991).

For a court to conclude that there are no genuine issues of material fact, the court must be satisfied that no reasonable trier of fact could have found for the non-movant, or, in other words, that the evidence favoring the non-movant is insufficient to enable a reasonable jury to return a verdict for the non-movant. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In making this determination, the court should review all the evidence in the record, giving credence to the evidence favoring the non-movant as well as the "evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that evidence comes from disinterested witnesses." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000). The court "may not make credibility determinations or weigh the evidence" in ruling on a motion for summary judgment, *id.* at 150, and must review all facts in the light most favorable to the non-moving party. *First Colony Life Ins. Co. v. Sanford*, 555 F.3d 177, 181 (5th Cir. 2009).

## II.     Analysis

### A.  Disability Discrimination

Plaintiff alleges that Defendant failed to engage in the interactive process or offer to make a reasonable accommodation for Plaintiff, and that Plaintiff's disability was, at minimum, a motivating factor in Defendant's decision to terminate him. Alternatively, Plaintiff claims that he was regarded as disabled, in that he suffered from a minor physical impairment that did not limit

a major life activity but which Defendant nonetheless perceived as substantially limiting. Defendant, in turn, argues that Plaintiff was not a qualified individual, that any perceived disability did not factor into his termination, and that Defendant offered Plaintiff an alternative position on the steel manufacturing line.

Section 21.051 of the Texas Labor Code prohibits discrimination in employment based on "race, color, disability, religion, sex, national origin, or age." TEX. LAB. CODE ANN. § 21.051 (West 2015). The ADA similarly prohibits employers from discriminating against a "qualified individual on the basis of disability," which includes the decision to discharge individuals due to their disability. 42 U.S.C. § 12112(a). As both the Texas Labor Code and the ADA prohibit disability discrimination, courts look to analogous federal precedent when interpreting the Texas Labor Code. *See NME Hospitals*, 994 S.W.2d at 144; *Rodriguez v. ConAgra Grocery Prods. Co.*, 436 F.3d 468, 473-74 (5th Cir. 2006).

A plaintiff can prove disability discrimination through direct or circumstantial evidence. *Mission Consol. v. Indep. Sch. Dist. v. Garcia*, 372 S.W.3d 629, 634 (Tex. 2012); *see also EEOC v. LHC Grp. Inc.*, 773 F.3d 688, 694 (5th Cir. 2014). When a plaintiff lacks direct evidence, as in this case, he or she can rely on circumstantial evidence using the "burden-shifting mechanism of *McDonnell Douglas.*" *Garcia*, 372 S.W.3d at 629 (citation omitted); *see also Machinchick v. PB Power, Inc.*, 398 F.3d 345, 356 (5th Cir. 2005) (confirming that "at summary judgment, the *McDonnell-Douglas* burden-shifting analysis still applies to discrimination claims" brought under Texas's antidiscrimination laws).

The *McDonnell-Douglas* framework consists of three stages. *LHC Grp.*, 773 F.3d at 694. First, the plaintiff must make a *prima facie* showing of discrimination. *Id.* Once the plaintiff makes that showing, the burden shifts to the defendant-employer to articulate a legitimate non-

discriminatory reason for the adverse employment action. *Id.* Once the defendant articulates such a reason, the burden shifts back to the plaintiff to establish that the articulated reason was merely a pretext for unlawful discrimination. *Id.*

### a. *Prima facie case*

To establish a *prima facie* case of disability discrimination under either the ADA or Chapter 21, a plaintiff must show that: (1) he is disabled, has a record of having a disability, or is regarded as disabled; (2) he is qualified for his job; (3) he was subjected to an adverse employment action on account of his disability or the perception of his disability; and (4) he was replaced by or treated less favorably than non-disabled employees. *EEOC v. Chevron Phillips Chem. Co.*, 570 F.3d. 606, 616 (5th Cir. 2009); *see also Dreschel v. Liberty Mut. Ins. Co.*, 695 F. App'x 793, 798 (5th Cir. 2017) (per curiam) (using the above elements for both the Texas Labor Code and the ADA).

Here, the parties do not dispute that Plaintiff was disabled,[10] and he clearly suffered an adverse action when his employment was terminated.[11] Plaintiff's *prima facie* case fails, though, because he cannot establish that he was qualified for his job. A plaintiff can establish that he is "qualified" by showing that, at the time of his termination, "either (1) [he] could perform the essential functions of the job in spite of [his] disability," or "(2) that a reasonable accommodation of [his] disability would have enabled [him] to perform the essential functions of the job." *Moss v. Harris Cty. Constable Precinct One*, 851 F.3d 413, 418 (5th Cir. 2017). A function is "essential"

---

[10] Plaintiff has a clear record of disability shown by the voluminous medical records highlighting his ongoing symptoms, including "several active neurologic issues which may prevent his ability to work" nearly a year after his termination. Docket no. 37-34 at 2. In fact, Defendant's arguments in its motion for summary judgment rely on the existence of Plaintiff's disability as preventing him from returning to work. For that reason, the Court need not consider Plaintiff's alternative argument, that Defendant "regarded" Plaintiff as disabled.

[11] Docket nos. 37-4; 43-13. *See also Pegram v. Honeywell, Inc.*, 361 F.3d 272, 282 (5th Cir. 2004) ("[I]t is beyond dispute that a termination constitutes an adverse action.")

if it holds "more than a marginal relationship" to the employee's job. *LHC Grp.*, 773 F.3d at 697

(quoting *Chandler v. City of Dall.*, 2 F.3d 1385, 1393 (5th Cir. 1993)). Plaintiff bears the burden

of proving that he could perform the essential functions of the job, with or without accommodation.

*Id.*[12]

 In this case, Plaintiff cannot establish that he was qualified at the time of his termination.

When Plaintiff was discharged from the hospital on September 16, 2015, his discharge paperwork

made it clear that he could not return to work until cleared by a clinic physician. Docket no. 37-3

at 23; no. 37-11 at 7. Plaintiff did not receive return-to-work clearance from a physician before

his employment was terminated on November 30, 2015, and has to this date failed to provide such

clearance. Voluminous medical records from the time of Plaintiff's termination indicate Plaintiff's

continued inability to work. Plaintiff's own statements made while seeking disability benefits

further undermine his claim that he was qualified at the time of his termination.[13] Plaintiff has

also failed to show that a reasonable accommodation of his disability would have enabled him to

perform the essential functions of his job. Plaintiff acknowledges that his job involved cleaning,

maintaining, and repairing large glue spreaders, which required him to regularly lift twenty-five to

100 pounds and to climb, crouch, crawl, and handle big objects. Docket no. 37-5 at 3. Plaintiff

further admits that the only accommodation he requested was a modified schedule to allow him to

---

[12] Defendant must, thereafter, "merely point out that the evidence in the record is insufficient" as to Plaintiff's *prima facie* case. *Lavespere*, 910 F.2d at 178.

[13] Though not necessarily rising to the level of judicial estoppel, statements made in seeking disability benefits may undercut a plaintiff's later claim that he or she is qualified. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 805 (1999). In *Cleveland*, the Supreme Court held that while an employee's representation of her disability in a Social Security Disability Insurance ("SSDI") benefits application did not estop her from filing an ADA suit, "[she] cannot simply ignore the apparent contradiction that arises out of the earlier SSDI total disability claim[,] but must proffer a sufficient explanation." *Bell v. Hercules Liftboat Co.*, 524 F. App'x. 64, 67-68 (5th Cir. 2013) (quoting *Cleveland*, 526 U.S. at 805)). In other words, statements made in an SSDI application can "undermine the factual assertions necessary to [an] ADA claim." *Giles v. Gen. Elec. Co.*, 245 F.3d 474, 484 (5th Cir. 2001) (finding the plaintiff's assertion that his SSDI statements were made without consideration for reasonable accommodations was a sufficient explanation for the inconsistency). Here, Plaintiff fails to explain the apparent contradictions between his requested accommodations and the assertions made in his SSDI application.

attend his dialysis appointments. Docket no. 37-3 at 27. Plaintiff makes no showing that such an accommodation would have allowed him to perform the essential functions of the job. Accordingly, the Court finds that Plaintiff has not met his *prima facie* burden of proving that he was a qualified individual at the time of his termination.[14]

### b.  *Legitimate, nondiscriminatory reason*

Even if the Court were to assume that Plaintiff had established his *prima facie* case of disability discrimination, Plaintiff's claim still fails under the remaining two prongs.  If the plaintiff successfully establishes a *prima facie* case, the burden shifts to the employer to produce evidence that the adverse employment action was taken for a legitimate, nondiscriminatory reason. *Cannon v. Jacobs Field Servs., N.A. Inc.*, 813 F.3d 586, 590 (5th Cir. 2016). Defendant offers three reasons for Plaintiff's termination, each of which sufficiently constitutes a legitimate, nondiscriminatory reason for the adverse employment action.

Defendant's first proffered reason is that Plaintiff failed to provide a physician's written release as required by Defendant's FMLA policy. Docket no. 37 at 16; no. 37-40 at 4. Specifically, Plaintiff supplied a letter from a licensed vocational nurse (LVN), despite Plaintiff understanding his release must come from his physician. Docket no. 43-5 at 28; no. 37-12 at 7. The failure to comply with an employer's requirements regarding reinstatement constitutes a legitimate, nondiscriminatory reason for an adverse employment action. *See, e.g. Jefferson v. MillerCoors, LLC*, 440 Fed. App'x 326, 330-331 (5th Cir. 2011) (finding plaintiff's failure to update his work restrictions from a list of approved physicians constituted a legitimate, nondiscriminatory reason for an adverse employment action); *see also Diggs v. Burlington N. & Santa Fe Ry. Co.*, 742 F. App'x 1, 5 (5th Cir. 2018) ("It is undisputed that [the employer] had general procedures in place

---

[14] Since Plaintiff's *prima facie* case fails on this element, the Court need not examine whether Plaintiff has shown he was replaced or treated less favorably than a non-disabled employee.

for employees who wanted to return to work…. Failure to comply…provides employers with a legitimate, nondiscriminatory reason for taking an adverse employment action.").

Defendant's second proffered reason is that Plaintiff had exhausted his FMLA leave. Docket no. 37 at 16. His termination, Defendant argues, was therefore pursuant to its Collective Bargaining Agreement, which states that "[e]mployees who do not return to work after the end of their designated FMLA leave, or after 12 cumulative weeks of FMLA leave, will be dismissed from employment." Docket no. 37-12 at 7. This is a legitimate, nondiscriminatory reason for termination, as "[c]ommon sense dictates that since the statute states that an employer must hold open an employee's position for twelve weeks during his or her leave of absence, that is exactly what the employer must do and no more." *Beckendorf v. Schwegmann Giant Super Markets, Inc.*, No. 97-30539, 1997 WL 811826, at *2 (5th Cir. 1997); *see also Munoz v. Seton HealthCare*, No. A-11-CA-151-LY, 2013 WL 1293425, at *12 (W.D. Tex. Mar. 26, 2013) ("Defendants have put forth a legitimate, nondiscriminatory reason for the termination, which is that Munoz was terminated because Munoz had exhausted all of her FMLA leave….").

And finally, Defendant argues it offered Plaintiff an alternative position which he declined to take. Docket no. 37 at 16; no. 37-41 at 4. An employee's refusal of transfer to a vacant, available position can constitute a legitimate, nondiscriminatory reason for an adverse employment action. *Arrington v. Sw. Bell Tel. Co.*, 93 F. App'x 593, 598 (5th Cir. 2004) (finding employer's burden met when it showed that, among other things, the employee refused transfer to a new position). After all, "[u]nder the ADA, an employer is not required to give what it does not have," *Foreman v. Babcock & Wilcox Co.*, 117 F.3d 800, 810 (5th Cir. 1997), and "a disabled employee has no right…to choose what job he will be assigned…." *Jenkins v. Cleco Power, LLC*, 487 F.3d 309, 315 (5th Cir. 2007).

Accordingly, Defendant has proffered three legitimate, nondiscriminatory reasons for Plaintiff's termination. But that is not the end of the matter; the Court now turns to the third, and final, step of the *McDonnell-Douglas* framework, in which the burden shifts back to Plaintiff.

c. *Pretext and/or motivating factor*

It is the third and final step that distinguishes state law claims from those brought under the ADA. *See, e.g. Arismendez v. Nightingale Home Health Care, Inc.*, 493 F.3d 602, 607 (5th Cir. 2007) (noting the difference). Under the ADA, a plaintiff must "establish by a preponderance of the evidence that the articulated reason was merely a pretext for unlawful discrimination," *McInnis v. Alamo Cmty. Coll. Dist.*, 207 F.3d 276, 280 (5th Cir. 2000). A plaintiff at this stage must present "substantial evidence" that the employer's proffered legitimate, nondiscriminatory reason for termination is pretextual. *Delaval v. PTech Drilling Tubulars, LLC*, 824 F.3d 476, 480 (5th Cir. 2016); *see also Burton v. Freescale Semiconductor, Inc.*, 798 F.3d 222, 233 (5th Cir. 2015). Such pretext is established "either through evidence of disparate treatment or by showing that the employer's proffered explanation is false or 'unworthy of credence'" *See Laxton v. Gap, Inc.*, 333 F.3d 572, 578 (5th Cir. 2003). An explanation is false or unworthy of credence if it is not the "real reason" for the adverse employment action. *Id.* A plaintiff must establish such pretext for *each* discrete reason when the employer has proffered multiple reasons for termination. *Burton*, 798 F.3d at 233.

Texas law, however, allows a lesser showing; on a discrimination claim under the Texas Labor Code § 21.125, "a plaintiff can defeat a motion for summary judgment if he can show, or raise a genuine dispute of material fact, that, even if the defendant's stated reason is true, that another motivating factor was the protected characteristic." *Mead v. Lattimore Materials Co.*, 3:16-CV-791-L, 2018 WL 807032 (W.D. Tex. Feb. 9, 2018) (citing *Quantum Chem. Corp. v.*

*Toennies*, 47 S.W.3d 473, 480 (Tex. 2001) ("The plain meaning of [§ 21.125 of the Texas Labor Code] establishes a 'motivating factor' as the plaintiff's standard of causation in [an] unlawful employment practice claim …."")).

Here, Plaintiff's only evidence on disparate treatment is testimony that he knows other employees who took time off for various medical conditions and that they were not fired. Docket no. 37-3 at 40. But Plaintiff fails to present personal knowledge as to the other employee's medical conditions, the length of time they were out of work, whether they returned with a compliant physician's note, who their supervisors were, whether they requested accommodations, or whether they were offered alternative positions. Without more, Plaintiff cannot prove the "nearly identical circumstances" required for a disparate treatment claim. *See Hoffman v. Baylor Health Care Sys.*, 597 F. App'x 231, 235-26 (5th Cir. 2015) ("This standard renders employees not similarly situated when, compared to the plaintiff, the employees have different work responsibilities or different supervisors, or work in different company divisions, or were subject to adverse employment actions too removed in time or for violations to dissimilar in type.").

Without sufficient evidence of disparate treatment, the Court must determine whether Plaintiff has offered "substantial evidence" that each of Defendant's three proffered explanations are "false or unworthy of credence." *Laxton*, 333 F.3d at 572. Plaintiff has not done so. As to the first proffered reason, the lack of a physician's note, Plaintiff never submitted a proper physician's note as required by Defendant's policies, despite understanding the requirement. Docket no. 37-3 at 21. Plaintiff understood not only that he would need a work release but that he would need a release signed by his clinic physician, Dr. Carpenter. *Id.* at 24. The Court finds no evidence that Defendant did not require strict compliance with its return-to-work policy. On the contrary, before

Plaintiff's termination, Defendant's HR personnel, Santana and Schram, reported to Parker that Plaintiff "needed to have a medical release other than from an LVN." Docket no. 37-41 at 4.

As to Defendant's second proffered reason, the exhaustion of his FMLA leave, the Court does find that the timing of the decision casts doubt on the proffered reason for the action, as Plaintiff was not fired upon the expiration of his FMLA leave (October 28) but rather a month later (November 30). *See Brown v. Kastle Sys. of Tex., LLC*, No. H-08-2888, 2010 WL 3342219, at *20 (S.D. Tex. Aug. 25, 2010) (noting discrepancy between FMLA expiration and termination cast doubt on proffered reason). This would perhaps rise to the level of "substantial evidence" of pretext if Plaintiff had been working during that month-long interim and was suddenly terminated, but Plaintiff never returned to work after his FMLA leave ended on October 28, and Defendant was under no duty to grant leave after the statutory period expired. *Reed v. Petroleum Helicopters, Inc.*, 218 F.3d 477, 481 (5th Cir. 2000). And in any event, Plaintiff must offer substantial evidence of pretext for *each* of the proffered reasons. *Burton*, 798 F.3d at 233.

As to the third and final proffered reason, Plaintiff's refusal to take a replacement position, Plaintiff has offered no evidence to suggest this was not the "real reason" for his termination. Defendant quickly filled Plaintiff's original position out of necessity (docket no. 43-3 at 5-6) and offered Plaintiff a similar position. Docket no. 37-41 at 4. Defendant was under no obligation to provide Plaintiff with his chosen assignment upon return, *Jenkins*, 487 F.3d at 315, so with Plaintiff's refusal to accept the offered replacement position, Defendant had no available position for Plaintiff. The Court, therefore, finds credible Defendant's assertion that it terminated Plaintiff, in part, due to his refusal to accept alternative placement.

Nor, under state law, has Plaintiff established that his disability was a "motivating factor" in the decision to terminate him. *Quantum*, 47 S.W.3d at 480. Indeed, Plaintiff admits no one at

Steves & Sons made negative comments regarding his disability, his leave, or his requested accommodation. Docket no. 37-3 at 16 (admitting Parker said "[j]ust hurry up, get back, there is plenty of work" and that there was "[n]othing negative, just positive."). *See also id.* at 17-18 (remarking that Plaintiff never felt anyone discriminated against him for his disability).

### B. Failure to Accommodate

Plaintiff also brings a claim for failure to accommodate, asserting that Defendant failed to accommodate Plaintiff's disability, instead scolding him for showing up while needing dialysis and refusing to modify his schedule. Defendant responds that Plaintiff was not a qualified individual and that it appropriately engaged in the required interactive process.

The ADA "requires an employer to make 'reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability…'" *Delaval*, 824 F.3d at 481 (quoting 42 U.S.C. § 12112(b)(5)(A)). "To prevail on a failure-to-accommodate claim, the plaintiff must show: '(1)[he] is a qualified individual with a disability, (2) the disability and its consequential limitations were known by the covered employer, and (3) the employer failed to make reasonable accommodations for such known limitations.'" *Moss*, 851 F.3d at 417 (quoting *Feist v. La. Dep't of Just., Office of the Atty. Gen.*, 730 F.3d 450, 452 (5th Cir. 2013)).

The employee needing an accommodation bears the burden of informing his employer. *Chevron Phillips Chem. Co.*, 570 F.3d at 621. Once requested, an employer must then engage in an "interactive process," or a "flexible dialogue with the employee, with the goal of finding an appropriate accommodation for the limitation." *Id.* An employer's failure to engage in the interactive process violates the ADA, but where the breakdown is "traceable to the employee," there is no violation. *Griffin v. United Parcel Serv. Inc.*, 661 F.3d 216, 224 (5th Cir. 2011).

It is not a reasonable accommodation "to require the employer to eliminate essential job functions, modify job duties, reassign existing employees, or hire new employees." *Toronka v. Cont'l Airlines, Inc.*, 411 F. App'x 719, 724 (5th Cir. 2011) (quoting *Burch v. City of Nacogdoches*, 174 F.3d 615, 621 (5th Cir. 1999)). Nor does an employee have the "right to a promotion, to choose what job to which he will be assigned, or to receive the same compensation as he received previously." *Jenkins*, 487 F.3d at 315. After all, "[t]he ADA provides a right to reasonable accommodation, not to the employee's preferred accommodation." *Griffin*, 661 F.3d at 224.

Here, Plaintiff's claim fails because, as described above, he has not shown himself to be a "qualified individual" under the ADA and because there is no showing that Defendant failed to make the reasonable accommodations or, at minimum, engage in the interactive process. Rather, Defendant offered Plaintiff an alternative, available position – a position with equal pay and benefits, less strenuous physical work, and more room for advancement. Docket no. 37-41 at 4; no. 43-12 at 28-29. While it is true that Parker told Plaintiff "That's the only job I have," *id.* at 19, Defendant need not create a new job to accommodate Plaintiff, as "the law does not require affirmative action in favor of individuals with disabilities. It merely prohibits discrimination against qualified individuals with disabilities, no more and no less." *Turco v. Hoechst Celanese Corp.*, 101 F.3d 1090, 1094 (5th Cir. 1996). Though Defendant did not accept Plaintiff's proposed modified work schedule, Plaintiff requested that modification with respect to his prior position, a position that Defendant already replaced. There is no indication in the record that Plaintiff requested, and Defendant rejected, a modified schedule with respect to the alternative position. Accordingly, it cannot be said that Defendant failed to engage in any sort of interactive process with Plaintiff, and, in any event, Plaintiff has not shown himself to be a "qualified individual."

### C. FMLA Claims

Plaintiff next brings two claims under the FMLA: retaliation and interference. The FMLA allows eligible employees "to take reasonable leave for medical reasons, for the birth or adoption of a child, and for the care of a child, spouse, or parent who has a serious health condition." *Elsensohn v. St. Tammany Par. Sheriff's Office*, 530 F.3d 368, 372 (5th Cir. 2008) (citing 29 U.S.C. § 2601(b)(2)). When the employee returns to work, the employer must reinstate the employee "to the same position as previously held or a comparable position with equivalent pay, benefits, and working conditions." *Smith v. E. Baton Rouge Par. Sch. Bd.*, 453 F.3d 650, 651 (5th Cir. 2006) (citing 29 U.S.C. § 2614(a)(1)).

An employer may not "interfere with, restrain, or deny the exercise of or the attempt to exercise" any right provided under the FMLA, 29 U.S.C. § 2615(a)(1), nor can an employer "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." *Id.* § 2615(a)(2). These provisions create two types of claims, both of which Plaintiff asserts here: "(1) interference claims, in which an employee asserts that his employer denied or otherwise interfered with his substantive rights under the Act, and (2) retaliation claims, in which an employee asserts that this employer discriminated against him because he engaged in activity protected by the Act." *Kendall v. Walgreen Co.*, No. A-12-CV-847-AWA, 2014 WL 1513960, at *4 (W.D. Tex. Apr. 16, 2014).

If a plaintiff makes out a *prima facie* case for either claim, the burden shifts to his or her employer to articulate a legitimate non-retaliatory reason for the employment action at issue. *Caldwell v. KHOU-TV*, 850 F.3d 237, 245 (5th Cir. 2017) (citing *Miller v. Metrocare Servs.*, 809 F.3d 827, 832 (5th Cir. 2016). If the employer does so, the burden shifts back to the plaintiff, who must raise an issue of material fact that the employer's proffered reason was pretextual. *Id.*

The above framework, derived from *McDonnell Douglas*, is not always used in FMLA retaliation cases. Instead, the mixed-motive framework applies to cases in which retaliation was a motivating factor in, but not the sole reason for, the discharge. *Richardson v. Monitronics Int'l, Inc.*, 434 F.3d 327, 333 (5th Cir. 2005). The mixed-motive framework is the same as the *McDonnell-Douglas* framework until the final pretext stage. The plaintiff, instead of showing pretext, need only show that the employer's nonretaliatory reason, although true, is but one of the reasons for its conduct, another of which was retaliation. *Id.* "If the employee proves that discrimination [or retaliation] was a motivating factor in the employment decision, the burden again shifts to the employer, this time to prove that it would have taken the same action" despite the retaliatory animus. *Id.*[15]

### a. *FMLA Retaliation*

To establish a *prima facie* claim for retaliation under the FMLA, a plaintiff must show (1) he engaged in a protected activity; (2) he suffered an adverse employment action; and (3) there is a causal link between the protected activity and the discharge. *Perkins v. Child Care Assocs.*, 751 F. App'x 469, 473 (5th Cir. 2018) (citing *Acker v. Gen. Motors, LLC*, 853 F.3d 784, 790 (5th Cir. 2017)). The "causal link" prong is established when the evidence demonstrates that the employer's decision to terminate was based in part on knowledge of the employee's protected activity, *Medina v. Ramsey Steel Co.*, 238 F.3d 674, 684 (5th Cir. 2001), or, in other words, that the defendant had a retaliatory motive. *Fisher v. Lufkin Indus., Inc.*, 847 F.3d 752, 758 (5th Cir. 2017). When evaluating whether there is a causal connection, courts consider the temporal proximity between

---

[15] The Fifth Circuit has explicitly declined to decide whether the mixed-motive framework remains a viable method to establish FMLA retaliation claims following the Supreme Court's decision in *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338 (2013). *See Trautman v. Time Warner Cable Tex., LLC*, 756 F. App'x 421, 428 n.5 (5th Cir. 2018). Nonetheless, as in *Trautman*, this Court need not make that determination, as the outcome here is the same under either the *McDonnell-Douglas* or mixed-motive framework.

the FMLA leave and the termination. *Mauder v. Metro. Transit Auth. Of Harris Cty.*, 446 F.3d 574, 583 (5th Cir. 2006). The temporal proximity must be "very close." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 273-74 (2001) (per curiam) (noting that time periods of three and four months have been found to be "very close" and holding that a period of twenty months was not "very close.").

Here, Plaintiff sufficiently establishes his *prima facie* case of retaliation under the FMLA.[16] Plaintiff indisputably meets the first two elements: he engaged in a protected activity – his medical leave under FMLA, and he suffered from an adverse employment action – his termination. As to the causal link, assuming that Plaintiff's FMLA leave ended on October 28, 2015, he was terminated only one month later, which satisfies the "very close" temporal proximity requirement. *Breeden*, 532 U.S. at 273-74.[17]

Because Plaintiff meets his *prima facie* requirement, the burden shifts to Defendant to provide a legitimate, non-retaliatory reason for Plaintiff's termination. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 509 (1993). Defendant proffers the same three reasons for the FMLA claim as it did for the ADA claim. Docket no. 37 at 16 (lack of compliant physician note, expiration of FMLA leave a month prior to termination, and refusal to accept replacement position). For the same reasons as under the ADA, the Court finds these to be sufficiently legitimate, non-retaliatory reasons.

---

[16] The *prima facie* case is the same under FMLA as under Chapter 21 of the Texas Labor Code. *San Antonio Water Sys. v. Nichols*, 461 S.W.3d 131, 136-37 (Tex. 2015); *see also Evans v. City of Houston*, 246 F.3d 344, 353 (5th Cir. 2011). Accordingly, Plaintiff's retaliation claim fails under Chapter 21 for the same reasons as under the FMLA.

[17] Even if the Court were to assume, as Defendant argues, that Plaintiff's FMLA leave began on July 20 and ended on October 12, Plaintiff's termination would be six weeks after his return from FMLA-protected leave. That is sufficiently close in time. *See, e.g. Allain v. Bd. Of Supervisors of Univ. of La. Sys.*, 81 F. Supp. 3d 502, 511 (W.D. La. 2015) (finding causal link when plaintiff was fired six weeks after returning from FMLA leave).

The burden then shifts back to Plaintiff who must show, by a preponderance of the evidence, that either (a) the articulated reasons were pretext for retaliatory animus (the traditional *McDonnell-Douglas* pretext prong) or (b) that, while [the employer's] articulated reasons may be true, they are but one explanation for its conduct, another of which was retaliatory animus (the mixed-motive alternative). *Allain*, 81 F. Supp. at 511. Plaintiff shows neither.

As described above, Plaintiff has not shown that Defendant's reasons are pretextual, insofar as the Court finds no evidence in the record of a connection between a retaliatory animus and Plaintiff's FMLA leave. However, as to the exhaustion of Plaintiff's FMLA leave, it is questionable why Defendant did not terminate Plaintiff when he exceeded his FMLA leave in 2010 (docket no. 37-3 at 15-17) yet did so in 2015. Nonetheless, there is no indication of the length in which Plaintiff exceeded his FMLA leave in 2010 (aside from being "just over" the twelve weeks), much less the circumstances of his leave and his return, so the Court cannot make any inference from comparing 2010 and 2015. And in any event, Defendant was under no duty to grant leave after the statutory period expired. *Reed*, 218 F.3d at 481.

Nor does Plaintiff show, alternatively, that his FMLA leave was a "motivating factor" in Defendant's employment decision. *Richardson*, 434 F.3d at 333. It is true that at a meeting between Parker and Plaintiff, Parker referenced Plaintiff's taking "off for this massive FMLA" and noted that he "far exceeded the FMLA thing." Docket no. 43-12 at 5, 14. Nonetheless, immediately thereafter, Parker presented Plaintiff with a replacement position. *Id.* It, therefore, cannot be said that Parker's comment reveals a retaliatory motive – one which motivated Plaintiff's termination – when Parker immediately presented Plaintiff with an alternative position with "equivalent pay, benefits, and working conditions." *Baton Rouge Par. Sch. Bd.*, 453 F.3d at 651.[18]

---

[18] If anything, that final conversation reveals that Parker was upset with Plaintiff after Plaintiff raised concerns at someone allegedly having stolen his materials during his leave. Docket no. 43-12 at 8. It may be that this motivated

### b. *FMLA Interference*

To establish a *prima facie* claim for interference under the FMLA, a plaintiff must show (1) he was an eligible employee; (2) his employer was subject to FMLA requirements; (3) he was entitled to leave; (4) he gave proper notice of his intention to take FMLA leave; and (5) his employer denied him the benefits to which he was entitled under the FMLA. *Caldwell*, 850 F.3d at 245 (citing *Lanier v. Univ. of Tex. Sw. Med. Ctr.*, 527 F. App'x 312, 216 (5th Cir. 2013)). Unlike a retaliation claim, an interference claim does not require proof of discriminatory intent—the plaintiff must prove only an act of interference. *See Cuellar v. Keppel Amfels, LLC*, 731 F.3d 342, 350 (5th Cir. 2013).

Though a plaintiff need not prove intent, he must prove some prejudice as a result of the employer's interference. *Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002). "A plaintiff is prejudiced if [he or she] was either denied leave or refrained from taking leave due to an employer's discouragement." *See Crankshaw v. City of Elgin*, 1:18-CV-75-RP, 2019 WL 3883566, at *7 (W.D. Tex. Jan. 14, 2019) (citing *De La Garza-Crooks v. AT&T*, No. 00-5096, 2001 WL 361099, at *1 (5th Cir. Mar. 22, 2001) (unpublished)). And "[w]hen a plaintiff in fact receives the requested leave, the plaintiff suffers no injury." *Id.*

Here, Plaintiff's claim fails at the *prima facie* prong because he has not established any interference that prejudiced him as a result. Assuming the facts in a light most favorable to Plaintiff, as the Court must do here, Plaintiff received approval for FMLA leave from August 5, 2015 through October 27, 2015 – the full twelve weeks required by the FMLA. Docket no. 43-5

---

Plaintiff's termination, but the FMLA forbids retaliation for engaging in activity protected under the FMLA; it does not immunize an employee from termination motivated by other nondiscriminatory and nonretaliatory factors.

at 71. Indeed, seventeen weeks passed between the beginning of Plaintiff's leave and his termination on November 30, 2015.

Though not raised in its pleadings, Plaintiff later alleges that Defendant committed *per se* FMLA interference in its failure to provide Plaintiff with FMLA notice, which may constitute interference with an employee's exercise of his FMLA rights. *See Downey v. Strain*, 510 F.3d 534, 539 (5th Cir. 2007). Plaintiff argues, and Defendant concedes, that Defendant did not provide Plaintiff with either his FMLA Designation Notice (Form WH-382) or his Notice of Eligibility and Rights & Responsibilities (Form WH-381) during his FMLA leave, instead unilaterally designating Plaintiff's leave as FMLA-qualifying. Docket no. 37-42 at 2. Defendant claims it did not provide such notification to Plaintiff because Plaintiff was in a coma, and Defendant wanted to "avoid compounding [Plaintiff's] family's concerns with *pro forma* federal employment forms." *Id.*

Plaintiff argues this interfered with his exercise of his FMLA rights, but as the plaintiff in *Ragsdale*, Plaintiff "has not shown that [he] would have taken less leave…if [he] had received the required notice." *Ragsdale*, 535 U.S. at 90. Indeed, Plaintiff merely recites that Defendant failed to provide these notices without alleging any form of prejudice stemming from that failure. Without any resulting prejudice, the Court has no basis to find interference. To hold otherwise would be to improperly relieve Plaintiff of the burden of proving any real impairment of his rights and resulting prejudice. *Downey*, 510 F.3d at 539 (quoting *Ragsdale*, 535 U.S. at 90).

**CONCLUSION**

Accordingly, Defendant's Motion for Summary Judgment (docket no. 37) is GRANTED with respect to all claims. The Court GRANTS IN PART Defendant's Motion to Strike Response

(docket no. 46) and DISMISSES as moot Defendant's Motion to Strike Designation of Expert Witnesses (docket no. 38).

The Clerk is DIRECTED to enter judgment in favor of Defendant and against Plaintiff. Plaintiff shall take nothing by his claims.

It is so ORDERED.

SIGNED this 29th day of October, 2019.

_____
XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE